Beth K. Findsen (023205)
LAW OFFICES OF BETH K. FINDSEN, PLLC
7279 E. Adobe Drive Suite 120
Scottsdale, AZ 85255
480-584-6664
beth@findsenlaw.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| EDEL MOLINA and MARIA HERNANDEZ,<br><br>             Plaintiffs,<br><br>             vs.<br><br>GMAC MORTGAGE LLC, RESIDENTIAL FUNDING COMPANY, LLC FKA RESIDENTIAL FUNDING CORPORATION, THE BANK OF NEW YORK TRUST COMPANY  N.A.,  MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., , JOHN DOES 1-100<br>             Defendants | Case No.: CV-09-<br><br>**ORIGINAL COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

For their complaint against the Defendants, Plaintiffs hereby allege as follows:

### I.   INTRODUCTION

1. Plaintiffs were the victim of various frauds, misrepresentations, and unfair

and deceptive practices perpetrated against him by certain of the defendants

in connection with the residential mortgage loan taken in connection with

1

the purchase of their primary residence in December 2005.   Defendants failed to make material disclosures regarding the terms of the loans, the true parties to the loan (the true lender) and the incentives provided to the true parties and to the detriment of the plaintiffs, the rate of interest, the true settlement charges, the affordability or suitability of the loan, the securitization plans for their loan that would result in hidden agreements affecting the terms and ownership of their Note, and other complex terms of their mortgage loans.  Many of the terms were fraudulently concealed until just recently.

2.  As more specifically set forth below, Plaintiffs seek statutory, compensatory, and punitive damages against the various defendants, as well as declaratory and equitable relief, and their reasonable attorneys' fees and costs.  Plaintiffs seek declaratory relief as to what (if any) party, entity or individual or group thereof is the owner and/or entitled to enforce the original promissory note executed at the time of the loan closing, and whether the Deed of Trust secures any obligation of the Plaintiffs.

### PARTIES, JURISDICTION & VENUE

3.  Plaintiffs Edel Molina and Maria Hernandez are individuals residing in Maricopa County, Arizona.  Plaintiffs are the owner in fee of the subject real

property, which is located in Maricopa County, Arizona, and is their primary residence.

4. Venue is proper in Maricopa County, Arizona, and the Court has jurisdiction to hear this matter, as conferred by 15 U.S.C. §1640(3) and 28 U.S.C. 1331, 1337.  The Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. §2201.  Plaintiffs further plead the pendent jurisdiction of the Court as to the various related state law causes of action.

5. Executive Trustee Services, LLC ("Executive") is named as the Trustee of the Deed of Trust on the subject property.    Executive is incorporated in the state of California.  Executive has been notified of Plaintiffs' Dispute of the Debt and Objections to the Trustee Sale via letter dated, June 23, 2009, USPS Delivery Confirmation  2103 8555 7491 1179 6022, received via signature June 26, 2009.   Executive is not a defendant.

6.  Meritage Mortgage Corporation ("Meritage")  was the subprime mortgage unit of NetBank, and is now defunct.  Meritage represented itself as the Lender on the closing documents, the Note, and the Deed of Trust, although in reality, the loan was funded by investors in GMAC and RFC's securitization scheme, and subject to GMAC and RFC's underwriting guidelines.  Meritage is not a defendant.ckckc

7.  Defendant GMAC Mortgage, LLC ("GMAC") is, a corporation organized under the laws of the State of Delaware.   GMAC is the sub-servicer of the loan.  At all times material hereto, GMAC was a member of the MERS system described herein and a creator, originator and principal shareholder of MERS.

8.  Defendant Residential Funding Company, LLC fka Residential Funding Corporation is a corporation organized under the laws of the State of Delaware.  RFC is the current master servicer under the securitization transaction described herein.

9.  Defendant Bank of New York Trust Company, N.A. is a national association with a corporate home office in the state of New York.  The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank, N.A. has been identified as the Trustee for the "owners" of the Plaintiffs' loan.

10. Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a corporation organized under the laws of the State of Delaware.  MERS is a corporation that offers electronic registration and tracking services of mortgages and claims to be beneficiary and/or trustee of the subject note.  In addition, MERS is listed as the "beneficiary" of the Deed of Trust on the subject property, and purported to Notice the Substitution of Trustee to Executive, and to order the sale, as "beneficiary" under the Deed of Trust.

11. John and Jane Does 1-100, are persons or entities that are unknown to Plaintiffs. Their capacities are unknown. On information and belief, these are unknown individual persons who have invested in the security(ies) that may be the "holders in due course" of the subject note on Plaintiffs' subject property. Plaintiffs will amend their complaint to allege their true identities, capacities and roles as and when they are ascertained.

## FACT ALLEGATIONS

12. Plaintiffs are Cuban Americans who do not speak English very well. Edel Molina is a truck driver. Maria Hernandez is a maintenance worker. Plaintiffs wanted to pursue the American dream and own their own home. They took out a loan to buy the subject property house, commonly known as 8364 West Dahlia Drive, Peoria, AZ 85381,  with a legal description of Lot 6 Sweetwater Place Unit II, according to Book 388 of Maps, page 1, records of Maricopa County Arizona. [hereinafter "Subject Property"]. Plaintiffs were not English speakers, nor were they sophisticated real estate buyers, and they reasonably relied on the oral statements of the respective defendants, and each of their employees and/or agents, throughout the financing process.

13. Plaintiffs each filled out a Uniform Residential Loan Application by telephone with Blake Bottle, an employee with the mortgage broker, Allegro

Financial.  Apparently, plaintiffs qualified for the loan based upon stated income and credit score alone.  Interestingly, a second Uniform Residential Loan Application was dated November 30, 2005, the day before most of the closing papers were signed.  Clearly, the non-English speaking Plaintiffs were "helped" with the application by Meritage employees, they were not provided with a Good Faith Estimate within three days of signing the loan application, and they were not provided a copy of the application to review prior to it being submitted to the "lender" for approval.

14. Plaintiffs were qualified for a sub-prime, 2-28,  $290,000 loan, with an adjustable rate, interest only, negative amortization, and  a whopping index change of 5.875 plus the index (6 month LIBOR) after two years.

15. Plaintiffs were not required to provide any income verification to demonstrate their ability to repay the loan.  Plaintiffs' credit score and the so-called appraisal of the Subject Property were the only criteria used by Meritage, and its affiliates to qualify Plaintiffs for the loan that is the subject of this action, and which was designated for almost immediate securitization and purchase by the supposed underwriting guidelines set forth by GMAC and RFC in the Securitization Documents.

16. Prior to the closing, Plaintiffs were not provided the preliminary disclosures referred to as the Good Faith Estimate, as required by the Truth in Lending

Act pursuant to 12 CFR (Regulation Z) within the deadlines provided by the

Act, and failed to provide the preliminary disclosures required by the Real

Estate Settlement Procedures Act ("RESPA") pursuant to 24 C.F.R

§§3500.6 and 3500.7

17. On December 1, 2005, Plaintiffs signed the closing papers in English, with

no explanation.  Plaintiffs were not told and did not realize that they were

paying a higher interest rate so that a yield spread premium would be paid to

the mortgage broker  An undisclosed Yield Spread Premium ("YSP") is a

per se violation of 12 CFR §226.4(a), §226.17, and 18(d) and (c)(l)(iii).  The

YSP raised the interest rate which was completely unknown or approved by

the Plaintiffs as he did not receive the required Good Faith Estimate .

Plaintiffs also did not receive a finalized HUD-1 Settlement Statement, or a

properly dated and executed Notice of Right to Cancel.

18. The loan was in the form of a promissory note for $290,000,[1] secured by a

separate Deed of Trust.

19. The Note included an "Adjustable Rate Rider," whereby the initial interest

rate was set at  6.875% from the Closing Date until  January 2008

(hereinafter the "Change Date").  The interest rate would be subject to

change on the first Change Date and then every six months thereafter.

---

[1]  A true and correct copy of the Promissory Note is attached hereto as Exhibit A.

20. Upon each successive Change Date, the adjusted interest rate was calculated by adding a whopping 5.875 points to the applicable six month London Interbank Offered Rate (hereinafter "LIBOR"). The Note capped the adjusted interest at 13.875% and set 6.875% as the floor.

21. The Note had an attached Prepayment Addendum that provided that any prepayment within the first two years of the Note resulted in an advance penalty payment of a six month's interest.

22. The Note also included an Interest Only Addendum providing that their first 120 payments would be interest only payments. Their initial interest only payment on the First Note would be $1,661.46 beginning February 1, 2006. After the Change Date, the payments were predicted to jump to $2,144.79 for six payments, followed by 30 monthly payments of $2,507.29, and then 300 payments of $2,712.28. These predictions were incorrectly based upon low changes in the LIBOR index, rather than the worst possible scenario. Even as optimistically predicted, this payment schedule negatively amortized the Note over the first 60 months of the life of the loan.

23. The Final Truth in Lending (dated the date of closing and not prior, as required), differed dramatically from the draft Truth in Lending. The settlement charges over the life of the loan jumped up by $248, 124.92. The

APR jumped from 7.157% to 9.9%.  These are significant changes that were

not explained to Plaintiffs.

24. There was no notice provided as required by A.R.S. §6-631(B) disclosing

"in close proximity to the consumer's signature line" that "you may request

the initial disclosures prescribed in the Truth in Lending Act be provided in

Spanish before signing any loan documents."

25. There were numerous other non-disclosed charges and inflations in the

settlement charges that Plaintiffs did not know about or have reason to know

about because GMAC concealed them,  until he had their loan papers

audited, and their counsel conducted extensive independent research and

consulted experts.     The charges include improperly disclosed yield spread

premiums, processing fees, administrative fees, and broker fees.

26. The property was appraised for $350.00 by the lender's appraiser. (paid by

Plaintiffs).  The appraisal was inflated.     This value came crashing down in

2008.  In addition, Plaintiffs suffered a reduced income and inquired

numerous times about obtaining a loan modification.  Ultimately, after

Defendant GMAC induced Plaintiffs to commit substantial time and effort to

the process, GMAC refused to modify their loan, without good reason.

During this entire process, GMAC held itself out as the actual lender, with

the ability to modify the loan, despite its true status of the sub-servicer of the

loan, without a true stake in ownership of the note, and subject to and bound by restrictions in contracts between the true lender and the investors in the mortgage backed securities.

27. After the closing, the Deed of Trust[2] was recorded in the Maricopa County Court Recorder's Office on December 7, 2005, naming the lender as "Meritage Mortgage" and the beneficiary as Defendant MERS. The Trustee is designated as the title company, Transnation Title Insurance Co.

28. There is a year and a half gap in the recordings. Next appears a Substitution of Trustee,[3] recorded April 6, 2009, purporting to change the trustee from Transnation Title Insurance Company to Executive Trustee Services, LLC. The Substitution is signed by "Mortgage Electronic Registration Systems, Inc." by "Cindy Sandoval, Assistant Secretary" and is notarized in California, Los Angeles County by Dee Ortega. Cindy Sandoval and Dee Ortega are employees of Executive, not MERS.

29. Also on April 6, 2009, a Notice of Trustee's Sale on the subject property was recorded. The Notice of Trustee's Sale and the simultaneously filed Substitution of Trustee have suspicious elements that smack of fraud.

---

[2] A true and correct copy of the Deed of Trust as recorded is attached hereto as Exhibit B.

[3] A true and correct copy of the Substitution of Trustee as recorded is attached hereto as Exhibit C.

30.  The Notice of Trustee's Sale[4] lists MERS as the Beneficiary and Executive Trustee Services LLC as the Trustee.   Interestingly, the claimed signatory "Marvell L. Carmouche, Limited Signing Officer" for Executive has very similar handwriting to "Cindy Sandoval, Assistant Secretary" who signed the simultaneously recorded Substitution of Trustee, purportedly for MERS. This document is also witnessed by Dee Ortega. in California.   Neither Cindy Sandoval nor Marvell Carmouche display or prove their competency to sign and bind either company.  Nor is there any explanation provided as to why the so-called MERS executive and the so-called Executive executive have identical handwriting..

31. There is no explanation forthcoming from Defendants as to how and when the loan was sold to the current holder.  The note was securitized from the beginning, and this material information was withheld from Plaintiffs. Pursuant to the securitization, a series of transfers and "true sales" were contemplated.  This chain of transfer contradicts the transfers and timing now disclosed on the public record by GMAC.

32. In addition, the note is now governed by contracts and terms between "the investors" (and the "true lender," an indispensable party who is unnamed and should be discoverable from the Defendants but whose identity has been

---

[4] A true and correct copy of the Notice of Trustee's Sale is attached hereto as Exhibit D.

hidden from Plaintiffs, despite Plaintiffs' repeated requests for this material

information regarding the security instrument on their subject property)  and

GMAC and RFC, contracts that were undisclosed to Plaintiffs, that

materially affect the security instrument, and that were not agreed to by

Plaintiffs.

33. GMAC has consistently obfuscated Plaintiffs' numerous requests (via

letters, phone calls, and a QWR sent June 23, 2009 and received by GMAC

on June 26, 2009.   In response to Plaintiffs' counsel's second letter

requesting information regarding the holder of the note, on July 10, 1009,

GMAC sent a letter objecting to each and every inquiry as though it were a

discovery request, and providing paltry or no information regarding the

legitimate questions about who owned their note, and who was being paid

for it, and in what amounts.[5]

34. Plaintiffs relied upon the perceived "due diligence" of the apparent "lender"

(the mortgage broker and GMAC and RFC, the loan sponsors and servicer

and master servicer respectively), in executing and accepting the closing

documents. In fact, no "lender" was involved in the closing in the sense of

an entity performing due diligence and evaluation pursuant to national

standards for underwriting7 and evaluating risk of loaning money in a

residential loan closing.  GMAC, RFC, and MERS were involved in the loan from the beginning, but concealed this information from Plaintiffs.

### GMAC and RFC's Securitization Machine

35. GMAC and RFC were big players in the securitization of mortgages, particularly sub-prime mortgages like the Plaintiffs.'   In 2001,  Mortgage Banking reported, "GMAC-RFC expects to do $22 billion in purchased originations this year, ***the difference being that it has grown other loan-type businesses such as asset-backed, subprime lending*** and home-equity lending."[6]  Eric Scholtz, an executive vice president in the Residential Capital Group stated "We are still involved in jumbo and alternative-A lending, but this has been a place where the GSEs [government-sponsored enterprises] have taken bigger bites of the pie."[7]

36.  According to a 2002 press release, "GMAC-RFC, a wholly owned subsidiary of GMAC Financial Services, is a leading private issuer of mortgage-backed securities and home equity loan asset-backed securities, and the No. 1 warehouse lender in the United States. The company leverages

---

[6]  MORTGAGE BANKING, *GMAC-RFC's Worldwide Reach*, June 1, 2001 (emphasis added).

[7]  *Id.*

its strengths in securitization, lending and investment to offer a broad

portfolio of innovative capital solutions to businesses in a variety of markets.

In the second quarter of 2002, GMAC-RFC issuance totaled $7.7 billion,

which included ***3.0 billion in subprime;*** a record $1.6 billion in alternative

A  product; and the first hybrid 5-1 adjustable rate mortgage (ARM)

issuance of $280 million off its RFMSI shelf. In addition, the company

issued a record $662 million of program exception product via its RAMP

shelf, which included product primarily comprised of loans whose credit

quality falls outside the guidelines of the company's jumbo, alternative A

and subprime programs.[8]

37. In addition, GMAC-RFC led all subprime issuers during the first half of the

2002, with a 12 percent market share.  As shown in the table below, the

extremely profitable business of securitizing sub-prime mortgages was one

that GMAC and its sibling subsidiaries began to take on at greater and

greater volume, and with significant billion dollar shares.

38. Thus, according to industry articles and GMAC's own press releases and

statements, the securitization of sub-prime and Alt-A loans was extremely

profitable for GMAC and RFC.   The success of the sub-prime

securitizations can be measured by this table of volume[9] posted by

Defendants in their 424(b) Prospectuses.

39.   The sub-prime boom came crashing down in 2007, with devastating

consequences for homeowners.  Gretchen Morgenson, in the April 6, 2007

*New York Times*, reported in "Fair Game; Home Loans:  A Nightmare

Grows Darker," that "with home foreclosures and mortgage delinquencies

soaring, it is becoming clear that the innovative loans that lenders

championed . . . are turning the American dream into a nightmare for many

borrowers."  Ms. Morgenson quoted Thomas A. Lawler, founder of of

*Lawler Economic and Housing Consulting Daily,* that subprime loans,

similar to the one in this action, "are designed to make borrowers refinance

---

1. [9] FIRST LIEN MORTGAGE LOANS

YEAR ENDED DECEMBER 31,

| VOLUME BY AVERAGE NUMBER OF LOANS | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| Prime Mortgages(1) | 68,077 | 86,166 | 55,773 | 91,631 | 141,188 |
| Non-Prime Mortgages(2) | 136,789 | 200,446 | 170,696 | 173,796 | 132,069 |
| Total | 204,866 | 286,612 | 226,469 | 265,427 | 273,257 |
| Prime Mortgages(1) | 33.23% | 30.06% | 24.63% | 34.52% | 51.67% |
| Non-Prime Mortgages(2) | 66.77% | 69.94% | 75.37% | 65.48% | 48.33% |
| Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

and keep the production mill churning." Ms. Morgenson summed up the irony, "[w]hile subprime borrowers try to climb out of the holes that they fell into, those who sold and packaged the loans are laughing all the way to the bank. 'Folks who ran these companies are going to walk away not just unscathed but extraordinarily well rewarded.' "(quoting Michael D. Calhoun, President of the Center for Responsible Lending)

40. As Senator Dodd, Chairman of the Senate Committee on Banking, Housing, and Urban Affairs stated at the March 22, 2007 Committee hearing on "Mortgage Market Turmoil:  Causes and Consequences," our mortgage market "appears to have been on steroids in recent years" and further noting:

> The subprime market has been dominated in recent years by Hybrid ARMS, loans with fixed rates for 2 years that adjust upwards every 6 months thereafter.  These adjustments are so steep that many borrowers cannot afford to make the payments and are forced to refinance, at great cost, sell the house, or default on the loan. ***No loan should force a borrower into this kind of devil's dilemma.   These loans are made on the basis of the [inflated] value of the property, not the ability of the borrower to repay.   This is the fundamental definition of predatory lending.***

(emphasis supplied).

41. After playing a prime role in creating the subprime debacle that devastated the world economy, GMAC lined up to receive federal bailout money of $5 billion in December 2008, $7.5 billion in May 2009, and is scheduled to receive another $1 billion under the President's Home Affordable

Modification Program ("HAMP").[10]  Yet, GMAC's dismal track record shows that it still fails regularly to provide sustainable modifications for the Americans losing their homes, such as Plaintiffs.

### b.    Behind the Scenes Securitization of Plaintiffs' Note

42.  After Plaintiffs' signatures were obtained on their promissory note and deed of trust, on terms that were doomed to failure, unbeknownst to them, a whole series of transactions were effected to securitize their note, which was the profitable incentive for making loans that could not be repaid.   This shadow transaction occurred in connection with their loan, was fundamentally tied to their loan, but it was not disclosed to them, nor were they a party to it.

43.  As discussed above, MERS falsely represented in numerous  recorded documents that it was the beneficiary under the Deed of Trust.  The documents show that MERS was intended to be a "gap" and a "hiding place" for the disclosure of the true parties in interest to Plaintiffs' loan.

---

[10]  WHO'S BEHIND THE FINANCIAL MELTDOWN?  THE TOP 25 SUBPRIME LENDERS AND THEIR WALL STREET BACKERS, *You Broke It, You Fix it?  Subprime Players Get Tax Money to Fix Subprime Mess*, (August 25, 2009). www.publicintegrity.org.

44.  The securitization documents specify a series of transfers of the Plaintiffs'
note (among a pool of other sub-prime loans), but the agreements specify
that the public record will only show that the note was transferred to the
MERS system.   This would allow the member banks to see the transfers, but
not the public, clouding the public transparency of the title.   In this case,
MERS didn't even purport an assignment to the "trustee" but just continued
to claim beneficiary status on its own.

45. All of the parties to the securitization were inter-related, affiliates or
subsidiaries of one another.  The typical GMAC securitization prospectus
shows the entities' relationship with the following table:



------------------   --------------------------------   ----------------------------

46.  For the Plaintiffs' loan, GMAC has deigned to disclose (after much urging

pursuant to Truth in Lending) that GMAC Mortgage is the sub-servicer, and

that RFC is the Sponsor and Master Servicer for the Loan.  The current

Trustee is alleged to be The Bank of New York Trust Company, N.A. as

successor to JPMorgan Chase Bank, N.A.

47.   The Transaction documents show that a series of sales were purportedly

effected, some theoretically designed as "true sales" and not assignments, to

avoid tax liability and creditors.  These "sales" show an entirely different

path than the path of the Deed of Trust as represented to Plaintiffs and to the

real estate buying public.

48. First, the "loan seller," sometimes also the originator, sold the pool of

mortgage loans to the depositor. Then the Depositor, a special purpose

corporation set up to provide bankruptcy-remote status, sold the mortgage

assets to the issuing entity in a "true sale."   Simultaneous with a trust's

purchase of a loan pool from the Depositor, the trust issued bonds or

certificates to the Depositor representing ownership interests in the trust.

The Depositor had an agreement to sell these securities to the Underwriters,

who are investment banks that re-sold the securities to the investors.

49. The proceeds of the sale of the certificates to the investors was used to "buy the notes" for the pool.[11]   The proceeds could also be used to pay the depositor back for buying the assets for the trust, and to pay for credit enhancements and insurance on the notes. **In other words, the investor's money funded the borrower's loans (and paid the handsome fees of the depositor, issuer, seller, sponsor, trustee, etc.).** GMAC did not risk a dime in its "purchase" of the loans for the pool, nor did RFC, nor MERS.   For each loan included in the pool, GMAC, RFC, and the Trustee made a huge profit and **did not invest the investor's full investment into the collateral.** To clarify, none of the parties attempting to foreclose Plaintiffs' home, after sanctioning the origination of a note that was doomed to failure, taking Plaintiffs' money each month, and  claiming to be applying payments to someone, have a pecuniary interest in the transaction, or standing to effect a judicial foreclosure.

---

[11] **USE OF PROCEEDS**

    The net proceeds from the sale of the offered  certificates  of any series to the underwriter  or the underwriters  for  any  series  will be paid to the depositor.  The depositor  will use the proceeds to purchase the mortgage  loans included  in the trust  established  for that  series or for  general  corporate purposes.

424(b) Prospectus for RFMSI 2006-S-3, www.secinfo.org.

50.  RFC and GMAC warranted to the investors in the certificates[12] that they had conducted due diligence on the loans and were following national standards for underwriting guidelines but they were not.[13]  They also warranted that the loans were in conformity with the federal laws, TILA, RESPA, SCRA, and their ilk.  They were not and GMAC knew it.

---

[12]  **UNDERWRITING STANDARDS**

All of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding described under *"Mortgage Loan Program--Underwriting Standards"* in the related base prospectus. Residential Funding may perform only sample quality assurance reviews to determine whether the mortgage loans in any mortgage pool were underwritten in accordance with applicable standards. See *"Mortgage Loan Program---Underwriting Standards"* in the related base prospectus.

The applicable underwriting standards include a set of specific criteria by which the underwriting evaluation is made.  However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually.  Rather, a mortgage loan will be considered to be originated in accordance with the underwriting standards described above if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards.

*See, e.g.,* RFCMSI 2006-S3 424(b) Prospectus, www.secinfo.org.

[13] *See* Interagency Guidance on Nontraditional Mortgage Products , 70 Federal Register, 77249, Dec. 29, 2005 ("[w]e are concerned that these products and practices are being offered to a wider spectrum of borrowers, including subprime borrowers and other who may not otherwise qualify for more traditional mortgage loans or who may not fully understand the associated risks." ) The guidance directed banks to tighten their lending practices for non-traditional mortgage products and focused in particular on interest-only mortgages and payment option ARMS.  The directive also noted that lenders are increasingly combining these types of products with other high risk practices, such as simultaneous second-lien mortgages and the use of reduced documentation in qualifying home loan borrowers.

51.  Per the terms of the securitization, The Depositor,  the special purpose corporation and affiliate of  GMAC and RFC, was supposed to deliver the original promissory notes, or cause them to be delivered to the Custodian, on the date of Closing.  This was after the previous "true sales" were supposed to have been made. Only the Defendants know if this occurred and where the note is.  Plaintiffs have requested this information on numerous occasions but Defendants have wrongfully withheld.it.

52.  The Securitization Transaction closed by March 30, 2006, a few short months after the alleged "loan closing."   This process fundamentally changed the character of their note from negotiable to non-negotiable.  It was securitized in a pool with numerous other notes to provide a "revenue stream" for investors in an undivided interest, or certificate.

53.  The note was no longer protected or treated as to its individual terms.  It was no longer for a "sum certain."  It was pooled with an interest in protecting the "revenue stream" for investors, with no interest in preserving its individual character for Plaintiffs, as promised in the terms of the Note which set forth that Plaintiffs' payments would be applied to their Note. The note could be substituted out of the pool and replaced with another note. Payments made on it could be applied across the pool in various ways. Plaintiffs do not know and Defendants have failed to provide discovery upon

their written request for an accounting, as to how the actual payments were applied by the master servicer, when distributed to the trustee, and distributed to the investors in the pool.

54.   Defendants have failed to show competent proof that MERS was a valid beneficiary, as per the records, at the time of the notice of sale, at the time of the sale itself, or ever.    The evidence is to the contrary, as MERS has repeatedly testified under penalty of perjury that it does not hold or own notes, take proceeds, or in any way have a pecuniary interest in the promissory notes or deeds of trust.

55.   Because Defendants are not in possession of the original note endorsed to them, and not otherwise entitled to enforce the note, and Defendants have no pecuniary or legal interest in the note that secures the deed of trust, there is no present right to initiate foreclosure under the security instrument nor the right to direct Trustee to foreclose and sell the subject property owned by Plaintiffs.

56.   Defendants and Trustee have each been put on notice of Plaintiffs' claim that Defendants have no present right to initiate foreclosure and demand has been made of Defendants to suspend any foreclosure sale unless and until it has obtained proof that GMAC, RFC, or MERS actually has in its possession the original note properly endorsed to it or assigned to it,

pursuant to the time deadlines as disclosed to the SEC and the IRS for the "true sales" and transfers of the note. Defendants have failed and refused to suspend the sale of the property or to provide proof of the basis of the right of QLS, GMAC or MERS to initiate foreclosure under the security instrument.

57.  Plaintiffs alleges that the Defendants, in so acting in this case and with respect to many other mortgage or trust deed security instruments engage in a pattern and practice of utilizing the non-judicial foreclosure procedures of this State to foreclose on properties when they do not, in fact, have the right to do so, knowing that the property owners affected do not have the knowledge and means to contest the right of Defendants to do so.

58.  Plaintiffs, through their attorney, has repeatedly demanded proof from the Defendants of their right to proceed in foreclosure.  No such proof has been provided.

59.  Plaintiffs, through their attorney, has further demanded a detailed accounting of how the stated amount necessary to be paid to redeem the property from foreclosure has been calculated so that Plaintiffs could adequately evaluate their rights under the law with a presale right of redemption.  The response of Defendants has been so inadequate so as to prevent Plaintiffs from determining whether any or all of the charges

included in their payoff demand are justified, appropriate, and proper under the terms of obligation evidenced by the negotiable instrument secured by the security instrument.

60.  In all of the wrongful acts alleged in this complaint, Defendants have utilized the United States mail in furtherance of their conspiracy to both unlawfully collect on negotiable instruments when they were not entitled to do so under the law. Assuming, *arguendo,* that they do have the right to proceed to foreclose under the Note, to profit from those actions in amounts greater than their rights under the Note to do so.

61.  Defendants, in committing the acts alleged in this and other cases, are engaging in a pattern of unlawful activity.

62.  As a result thereof, Plaintiffs has been damaged in having to hire attorneys before bringing this action and to bring this action to enjoin the threatened non-judicial foreclosure of the subject real property.  Plaintiffs had to and will have to incur attorneys' fees to stop the wrongful acts of the Defendants.  Plaintiffs has been damaged in other ways that are not readily apparent at this time, but will amend this complaint to allege further damages as they are determined.

63.  In pursuing non-judicial foreclosure, Defendants have represented that they have the right to payment under the Note, payment of which is secured by

the security instrument.  The true facts are that these Defendants  are not

entitled to enforce the note, not  in possession of the Note and they are not

either holders of the Note or non-holders of the Note entitled to payment, as

those terms are used in the Uniform Commercial Code, codified in Arizona

at A.R.S. §47-3101, *et. al.*, and therefore they are proceeding to foreclose

non-judicially without right under the law.

64.  Upon further information and belief, Defendants have added costs and

charges to the payoff amount of the Note that are not justified and proper

under the terms of the Note or the law.

**CAUSES OF ACTION**
**COUNT ONE**

**NOTICE OF SALE AND ATTEMPTED FORECLOSURE VIOLATED
ARS §33-801, ET. AL AND ARS §47-3301, ET AL
(AS TO ALL DEFENDANTS)**

1. Plaintiffs incorporate each of the allegations set forth in the foregoing

paragraphs by this reference as it fully set forth verbatim in this Count.

2. Defendants GMAC and MERS, through a Joint Venture, set forth in detail in

the Fact Allegations, and referred to as the Transaction, sought to wrongfully

foreclose on Plaintiffs' property.  In doing so, the defendants effected a series of

false recordings, fraudulent transfers, and improper notarizations.  At no time

did Defendants fulfill their burden, as the foreclosing parties, of showing that

they were proper parties authorized to enforce the terms of the Deed of Trust and the Note.    Under the Uniform Commercial Code, as codified at A.R.S. §47-3101, *et. seq.*, a promissory note is a negotiable instrument.  Under the law of negotiable instruments in Arizona, Defendants must be in possession of the original Note in order to foreclose on the subject property, or demonstrate that it is **<u>otherwise entitled to enforce the Note.</u>**

3. Defendants have pooled and sold the note, destroying its "negotiability" making the note subject to all defenses, including payment and satisfaction.  The note is no longer for a "sum certain."  Plaintiffs' payments have been applied to other notes and other notes' payments have been applied to their, all to protect a revenue stream for investors.  This transaction did not include Plaintiffs and was not disclosed to them, yet it materially changed the terms of their note.

4. Through the conduct described in this Complaint, Defendants attempted to collect on a debt to which they were not legally entitled as they were not in possession of the original Note, were not otherwise entitled to enforce the Note, were fraudulently concealing the true holder in due course of the Note, and did not have a pecuniary interest in the payments applied to the Note.

5. Defendants, in taking the actions aforementioned, have violated provision of the Uniform Commercial Code as codified at A.R.S. §47-3101, *et. seq.*, by

ordering, allowing, and holding an illegal foreclosure sale on the subject property.

6. The purported foreclosure sale did not conform to procedure or substance for conducting a lawful non-judicial foreclosure pursuant to the Arizona Deed of Trust Statutes, ARS §§33-801 *et al*

7. The deed of trust indicated that the Lender is Meritage Mortgage, the mortgage broker, but the securitization documents filed with the SEC show otherwise.

8. MERS was named as the beneficiary in the original Deed of Trust.   MERS was not a valid beneficiary and was named as a disguise for unrecorded transfers of the note as evidenced by the Securitization Documents discussed elsewhere.

9. The Notice of Trustee's Sale wrongly represented that MERS was the proper beneficiary under the Deed of Trust.   A Substitution of Trustee was invalidly executed by invalid beneficiary, MERS.

10. The deed of trust statutes contemplate that a beneficiary[14] under a deed of trust is a true party in interest, with the rights of a stakeholder.   Arizona law regarding non-judicial foreclosure does not contemplate that the "beneficiary"

---

[14]  ARS §33-801(1) defines a "beneficiary" as "the person named or otherwise designated in a trust deed as the person for whose benefit a trust deed is given, or the person's successor in interest." In later portions of the statute, by the context, it is understood that the beneficiary is intended to be an entity that has a pecuniary interest in the property, i.e. the true lender of the money, or some other entity with a pecuniary interest in the subject property. *See* §33-804 (beneficiary can appoint trustee); §33-804A (beneficiary may file an action to foreclose a deed of trust; §33-807 B (beneficiary is the proper and complete party Plaintiffs in an action to foreclose a deed of trust).

of the deed of trust is a computer database. MERS has sworn under penalty of perjury that it does not originate loans or hold title to anything. Arizona law governing non-judicial foreclosure does not contemplate or condone simultaneous beneficiaries, or hidden transfers supposedly rectified at the last minute by recordings with invalid notarizations by parties who have the title of "Assistant Secretary" of MERS (or no title at all) but also have the title of "Limited Signing Officer" for Executive, the Trustee.   The public recordings were signed by employees with no executive authority to bind the company; if they even work for MERS at all (the state where the notary is administered and where the signature is made appears to be the state where the trustee for the sale is located).

11. In Arizona, a trustee shall disclose the names and addresses for which the grantee holds title and shall identify the trust or other agreement under which the grantee is acting. ARS §33-404(A). MERS and Executive, with GMAC's cooperation and approval, misrepresented themselves as the true beneficiary and properly designated trustee. Defendants failed to disclose the true beneficiary at all (MERS was not a true beneficiary, and Bank of New York Trust Company, N.A. as successor to JP Morgan Chase Bank, N.A.,[15] a trustee

---

[15] Only recently, GMAC has responded to plaintiffs' counsel's letters by now claiming, after pressed under the Truth in Lending provisions that require disclosure of the owner or master servicer of the loan, claiming that the "the loan is currently owned by:  The Bank of New York

for a pass through trust with a tax status that does not allow it to own anything, is not a true beneficiary). In fact, no true beneficiary existed at the time of the sale, as the interest in the promissory note, arguably held by the investors in the mortgage backed securities, was destroyed by the parsing and tranching of the debt with other borrower's debts.

12. GMAC and MERS, acting by and through Executive, had reason to know that the Deed of Trust, Notice of Sale, and Substitution of Trustee contained false claims and recorded them or caused them to be recorded anyway in violation of ARS §33.320(A)(E).

13. Through the conduct described in this Complaint, Defendants have attempted to collect on a debt to which they are not legally entitled as they are not in possession of the original Note or otherwise entitled to enforce the Note.[16]

---

Trust Company, N.A. as successor to JPMorgan Chase Bank, N.A. as Trustee." See Letter dated August 13, 2009. Of course, this letter further admonishes "the loan is currently being subserviced by GMAC Mortgage and all legal inquiries should be directed to the sub-servicer." Further, GMAC still fails to name the special purpose vehicle which filed SEC documents and actually issued the certificates to the investors who are the true holders of whatever remains of the note that was fundamentally changed by the Defendants' machinations.

[16] According to the 424b5 Prospectus Supplement filed with the SEC, the note was contemplated to be transferred to a Custodian who would hold it for investors. Only the defendants know if this actually occurred on the date specified or at all.

*14.* Defendants, in taking the actions aforementioned, have violated provision of the

Uniform Commercial Code as codified at A.R.S. §47-3101, *et. seq.*, by

attempting to foreclose on the subject property without possession of the

original Note properly endorsed to it or assigned to it,  and without showing that

they are holders of the note entitled to enforcement, and without showing that

they are non-holders entitled to payment, as those terms are set forth in A.R.S.§

47-3301, *et seq.*

**COUNT TWO**
**Injunctive Relief**
**(As to GMAC, MERS, RFC)**

15. Plaintiffs incorporate each of the allegations set forth in the foregoing

paragraphs by this reference as if fully set forth verbatim in this Count.

16. Plaintiffs are faced with the clear and present danger of losing their Subject

Property due to threatened foreclosure action at a trustee's sale as alleged

herein.

17.  Neither Defendants GMAC nor MERS nor any purported assignee of MERS is

the proper beneficiary under the Note and Deed of Trust .

18.   Plaintiffs will suffer irreparable harm if Defendants are not enjoined from

selling Plaintiffs' Subject Property at a foreclosure or trustee's sale, as Plaintiffs

will lose their financial interest in the Subject Property, and Plaintiffs will have

no adequate remedy at law because the Subject Property is unique.

19. Pursuant to A.R.S. §12-1801, *et. seq.*, this Court has the power to enjoin Defendants from conducting a Trustee's Sale on the subject property until this Court resolves the issues between the parties.

20. Defendants, pending litigation, are threatening to conduct a Trustee's Sale on the subject property in violation of the rights of Plaintiffs.  If such Trustee's Sale is permitted to occur, such action would render this Court's judgment ineffectual.

21. Because Defendants are not entitled to enforce the underlying promissory Note described in the security instrument, Plaintiffs specifically seeks an injunction prohibiting Defendants from selling the subject property.  Defendants have failed to demonstrate that they are proper parties to bring a non-judicial foreclosure, abusing the privilege of bringing a non-judicial foreclosure, and trampling Plaintiffs's due process rights by refusing to demonstrate through a credible chain of evidence (or any evidence at all) that they are the holders in due course of the Note, or that they are foreclosing as a party entitled to enforce the terms of the Note and the security instrument.

22. As a result of the misconduct described in this Complaint, Plaintiffs is entitled to an injunction enjoining Defendants from conducting a Trustee's Sale on the subject property pending a final outcome in this litigation.

## **COUNT THREE**

### Breach of Contract
### As to Defendant GMAC

23. Plaintiffs incorporate each of the allegations set forth in the foregoing paragraphs by this reference as if fully set forth verbatim in this Count.

24. Plaintiff signed a promissory note with parties Meritage Mortgage as the supposed "Lender" and MERS as the alleged "Beneficiary" in English on December 1, 2005. GMAC acquired the servicing rights under Plaintiffs' promissory note by assignment on March 20, 2006. Securitization documents show that the loan was originated to fit into a pool that was being organized and formed prior to the origination. Securitization documents also contemplate that the note was transferred twice, once to the seller, and then to the depositor, and then placed in a trust.

25. The terms of the promissory note provide that Plaintiffs payments will be applied to pay down their Note.

26. GMAC and RFC concealed and hid their involvement and profit in the securitization of Plaintiffs' notes.

27. GMAC and RFC profited by Plaintiffs' note. The profit was greater the riskier Plaintiffs' note was.

28.  The true risks of foreclosure and negative amortization and adjustable interest rate were not disclosed to Plaintiffs.   The true parties were not disclosed to Plaintiffs.

29.  The securitization fundamentally changed the nature of Plaintiffs' note and destroyed negotiability.

30.  The pooling of notes, including Plaintiffs', into a pool designed only to protect a "revenue stream" for investors destroyed negotiability and the individual character of his note.  Later further division and securitization via collateralized debt obligations may have occurred.

31.  Plaintiffs' payments were not applied to their specific note as contracted.  The securitization documents provided that notes could be substituted in and out of the pool and borrowers payments could be applied across the pool in certain instances.

32.  Plaintiffs' note was no longer for a sum certain.

33.  The terms of Plaintiffs' contract were unconscionable.

34.  Plaintiff did not understand English and the contracts, including the note, were only offered in English.

35.  The foregoing breaches were material and the Plaintiffs were damaged thereby.

## COUNT FOUR

## **Breach of the Covenant of Good Faith and Fair Dealing**
## **(As to Defendants GMAC and RFC)**

36.   Plaintiffs incorporate each of the allegations set forth in the foregoing

paragraphs by this reference as if fully set forth verbatim in this Count.

37.   GMAC and RFC were involved at the inception of Plaintiffs' loan, a fact that

was not disclosed to Plaintiffs.  Defendants fraudulently concealed the

securitization of Plaintiffs' note.  Defendants also failed to disclose the true

parties to the transaction.

38.  GMAC's and RFC's underwriting guidelines and securitization plan governed

the transaction.

39. GMAC was assigned the sub-servicing rights for the note, simultaneously with

securitization of the note.  RFC was a transferee of the note as it made its way

through a series of off record transfers, "true sales," and assignments.

40.  GMAC and RFC failed to disclose their profits and side deals made with the

securitization of Plaintiffs' note.

41.  Plaintiffs' note was designed to fail by GMAC and RFC.

42.  A duty of good faith and fair dealing is implied in every contract in Arizona.

Defendants GMAC and RFC breached this duty by the existence of secret

parties, profits, and schemes, within the originating of Plaintiffs' loan.

## COUNT FIVE
### Violation of the Truth in Lending Act
### 15 U.S.C. §1601, et seq. and Regulation Z, 12 C.F.R. §201, et seq.
### (As to Defendants GMAC and any Assignees)

43. Plaintiffs incorporate each of the allegations set forth in the foregoing paragraphs by this reference as if fully set forth verbatim in this Count.

44. As defined in 15 U.S.C .A. §1602 and 12 C.F.R. §226.2, the transaction between Plaintiffs and Meritage (at GMAC's direction) was a "credit sale."

45. As defined in 15 U.S.C. §1602, Plaintiffs were each a "consumer," and Meritage, working as an agent of GMAC, in pursuit of loans for GMAC's securitization scheme, with a plan to immediately sell the note and assign the servicing to GMAC was a "creditor."   GMAC, as designated assignee and affiliate sponsor of the securitization was also a "creditor."

46.   According to plan, Meritage assigned the servicing rights to GMAC a few short months after the closing.  In addition, Meritage sold the note to the securitization sponsor/seller.

47. Pursuant to 15 U.S.C. §1638(b)(1) and 12 C.F.R. §226.17, Meritage (for GMAC) was required to make certain specified disclosures to Plaintiffs before the consummation of the credit transaction.

48. Pursuant to 12 C.F.R. §226.23, Meritage  (for GMAC) was required to furnish each individual holding an interest in the subject property with two (2) completed copies of the Right to Cancel notice.

49. Meritage violated 15 U.S.C. §1638 by improperly and/or inadequately

disclosing one or more of the following items to Plaintiffs:

    a.  The annual percentage rate

    b.  The finance charge;

    c.  The amount financed;

    d.  The total number of payments;

    e.  The payment schedule;

    f.  Whether the loan has a demand feature;

    g.  Whether the loan has a variable rate feature, and if so, to make disclosure

       about the variable rate feature;

    h.  Whether the borrower may be entitled to a refund of a portion of the

       finance charges;

    i.  Whether the loan is subject to a prepayment penalty, and, if so, to make

       disclosure about the prepayment penalty terms.

50. Fees were charged to Plaintiffs by Meritage ,under the guidance of GMAC and

RFC's accepted Underwriting Principles, without being properly disclosed

pursuant to 15 U.S.C. §1605 and Regulation Z of Section 226.4.

51. With regard to the loan obtained by Plaintiffs,  Meritage applied the annual

percentage rate based on improperly calculated and disclosed amounts and in

direct violation of 15 U.S.C. §1601, *et seq.* and Regulation Z Sections 226.18(c)

, 18(d), and 22.

52.  After learning within one year from the date of this lawsuit that there were

"investors" determining the criteria by which their loan could be modified,

Plaintiffs repeatedly asked for information regarding the true holder of the note.

They were entitled to this information under the Truth in Lending Act which

provides, "Upon written request by the obligor, the servicer shall provide the

obligor, to the best knowledge of the servicer, with the name, address, and

telephone number of the owner of the obligation or the master servicer of the

obligation." USC §1641(f)(2).  Defendant GMAC  repeatedly and wrongfully

refused to provide this basic information to Plaintiffs.

53.  As a result of Defendant's violations as set forth herein, Plaintiffs is entitled to

damages as set forth below.

54. Defendant GMAC, through its agents and affiliates, fraudulently

misrepresented and concealed the true facts related to the items subject to

disclosure to Plaintiffs, and Plaintiffs did not discover the Defendant's failure to

make such disclosures pursuant to 15 U.S.C. 1638 until one (1) year within the

filing of this Complaint.

**COUNT SIX**
**(Violation of RESPA, 12 U.S.C. §2601, *et seq.*)**
**(As to Defendants GMAC)**

55.  Plaintiffs incorporate each of the allegations set forth in the foregoing

paragraphs by this reference as if fully set forth verbatim in this Count.

*56.*  Defendant  GMAC is a "mortgage lender" with deposits or accounts insured

by a federal agency and/or a lender that is regulated by the federal government,

and therefore is subject to the Real Estate Settlement Procedures Act

("RESPA"), 12 U.S.C. §2601, *et seq.*

*57.*  The loan to Plaintiffs described herein is a federally related mortgage loan

subject to 12 U.S.C. §2601, *et seq.*

58.  Plaintiffs are consumers and  members of the class of consumers subject to

protection under 12 U.S.C. §2601, *et seq.*

59. Pursuant to 12 U.S.C. §2601, *et seq.,* Meritage was required to provide

Plaintiffs  with a uniform settlement statement, which must clearly and

conspicuously itemize all charges imposed upon the borrower and all charges

imposed upon the seller in connection with the closing of the loan.

60. Pursuant to 12 U.S.C. §2604, Meritage was also required to provide Plaintiffs

with a special information booklet, which was to contain in "clear and concise

language" a description and/or explanation of the following:

a.  Each cost associated with a real estate settlement;

b.  The uniform settlement form required by RESPA (with a sample copy of

the form);

   c.  The nature and purpose of escrow accounts used in connection with real estate transactions;

   d.  The choices available to residential real estate purchasers when they require necessary services incident to a real estate transaction;

   e.  Unfair practices and unreasonable or unnecessary charges that a prospective purchaser should avoid in connection with a real estate settlement.

61. Pursuant to 12 U.S.C. § 2604, Meritage was required to include a "good faith estimate of the amount or range of charges" for settlement services with the special information booklet described above.

62. Pursuant to 12 U.S.C. § 2604, Meritage was required to provide Plaintiffs a good faith estimate and the special information booklet no later than three (3) business days after Meritage received the loan application described herein.

63. Meritage was required to inform Plaintiffs at the time of application, whether the servicing of the loan could be assigned, sold or transferred during the life of the loan.

64. Meritage and GMAC were required to notify Plaintiffs of the assignment, sale, or transfer of the loan in writing at least fifteen (15) days before the event or at the time of settlement.

65.   Pursuant to 12 U.S.C. § 2607(a), Meritage and GMAC were prohibited from paying any "fee, kickback, or thing of value" to any person as part of the real estate settlement service involving the loan described herein.

66.   Meritage and GMAC were required to disclose any "controlled business arrangements" as defined in 12 U.S.C. §2602 to Plaintiffs.

67.   Meritage and GMAC violated RESPA by failing to provide Plaintiffs with the required disclosures described above within the required time periods provided for by the Act.  Meritage and GMAC through its agents and affiliates provided Plaintiffs with inaccurate settlement statements and good faith estimates prior to the closing of the transaction.

68.   Meritage and GMAC violated RESPA by failing to disclose "controlled business arrangements" to Plaintiffs.

69.   Meritage and GMAC violated RESPA by charging Plaintiffs unreasonably high fees for real estate settlement services.

70. Meritage and GMAC fraudulently misrepresented and concealed from Plaintiffs the true facts related to the items subject to disclosure, and Plaintiffs did not discover Defendant's failure to make required disclosures pursuant to 12 U.S.C. §§ 2601 and 2604 within one (1) year of filing this Complaint.

71. Based on Defendant's violations as described herein, Plaintiffs is entitled to damages under 12 U.S.C. §§ 2607 and 2608, and to claim damages for emotional distress according to proof.

72. Based on Defendant's violations as described herein, Defendants are liable to Plaintiffs in an amount equal to three (3) times the amount of charges paid by Plaintiffs for "settlement services."

## COUNT SEVEN

### (Violation of the Arizona Consumer Fraud Act, A.R.S. §§44-1521, *et seq.*) (As to Defendants GMAC, RFC, and MERS)

73. Plaintiffs incorporate each of the allegations set forth in the foregoing paragraphs by this reference as if fully set forth verbatim in this Count.

74. A.R.S. § 44-1522 prohibits the use of any "deceptive act or practice" in connection with real estate transactions.

75. A.R.S. § 44-1522(B) permits interpretations of 15 U.S.C. §§§ 44, 52, and 55(a)(a), the Federal Trade Commission Act, to be used as a guide in interpreting the term "deceptive." Interpretations of the term include representations that have a "tendency and capacity" to convey misleading impressions to consumers even though interpretations that would not be misleading are also possible. *Chrysler Corp. v. FTC,* 561 F.2d 357, 363 (D.C.

42

Cir. 1977).  In evaluating the representations, the test is whether the least sophisticated individual would be misled. *Exposition Press, Inc. v. FTC,* 295 F.2d 869 (2d Cir. 1961), *cert. denied,* 370 U.S. 917 (1962).

76.  GMAC, RFC, MERS and their agents used deception, false promises, and misrepresentations regarding the terms of the loan offered to Plaintiffs by misrepresenting, concealing, or omitting the terms of the loan, including, but not limited to, the true cost of the loan, the true parties to the loan, the interest rate, the payments to be made under the loan, Plaintiffs' ability to qualify for the loan, and Plaintiffs' ability to refinance the loan in the future.  Such facts were material in that Defendant knew, or should have known, that Plaintiffs would rely upon Defendant's representations in entering into the loan as alleged herein.

77.  Meritage, at GMAC's and RFC's behest,  acted as a "pretender lender" in loaning the investors' money to Plaintiffs without making a commercially reasonable determination of Plaintiffs' ability to repay the loan.

78.  GMAC knew, or should have known, that Plaintiffs would be incapable of making loan payments as required by the terms of the loan based upon Plaintiffs' income.

79.  GMAC omitted and concealed the magnitude of Plaintiffs' risk of losing the home.

80. GMAC, RFC and MERS transferred the note into the MERS system to provide a gap in the chain of title on the public records, to better facilitate their securitization transaction and to conceal the true parties, profits, and transaction from the plaintiffs and the public.

81. Plaintiffs relied upon Meritage's representations (as governed by GMAC's underwriting criteria) concerning the terms of the loan and their ability to repay the loan when entering the loan agreement.

82. Defendants' deceptive practices misled Plaintiffs into believing that they would be able to refinance the loan

83. Plaintiffs learned of Defendants' violations of A.R.S. §4-1522 within one (1) year of filing this complaint.

84. As a proximate result of the violations stated above, Defendants are liable to Plaintiffs for statutory damages according to the Arizona Consumer Fraud Act, for actual damages (including emotional distress) according to proof, and attorney's fees and costs.

85. Moreover, the conduct of Defendant in violation of the Arizona Consumer Fraud Act was so contemptible and egregious that Plaintiffs is entitled to punitive damages in an amount appropriate to punish Defendant and deter others from engaging in similar conduct.

## COUNT EIGHT
### (Conspiracy to Commit Fraud Related to MERS System)
### (As to Defendants MERS, GMAC, RFC)

86. Plaintiffs incorporate each of the allegations set forth in the foregoing paragraphs by this reference as if fully set forth verbatim in this Count.

87. Defendants MERS, GMAC, and RFC (hereinafter in this Count referred to as "Defendant Conspirators"), and each of them, did knowingly and willfully conspire and agree among themselves to engage in a conspiracy to promote, encourage, facilitate, and actively engage in fraudulent and predatory lending practices perpetrated on Plaintiffs as alleged herein as part of the business policies and practices of each of the Defendant Conspirators in the MERS system.

88. Upon information and belief, Defendant Conspirators, and each of them, are or have been creators, originators and controlling shareholders in MERS and/or members of the MERS system, and have participated in the design and coordination of the MERS system.

89. Upon information and belief, Defendant Conspirators have conspired among themselves and with other unknown parties to:

    a. Develop a system of earning profits from the origination and securitization of residential loans without regard to the rights of

Plaintiffs, and other similarly situated, by engaging in predatory and deceptive residential lending practices as alleged in this complaint above;

b.  In furtherance of the system referred to immediately above, Defendant Conspirators intentionally created, managed, operated, and controlled Defendant MERS for the specific purpose of MERS being designated as a sham "beneficiary" in the original deeds of trust securing those loans, including the loan made to Plaintiffs and other similarly situated individuals;

c.  Defendant Conspirators, and each and every one of them, intentionally created, managed, operated and controlled the MERS system with the unlawful intent and for the unlawful purpose of making it difficult or impossible for Plaintiffs and other victims of such industry-wide policies and practices to identify and hold responsible the persons and/or entities responsible for the unlawful actions of GMAC, MERS, RFC, and their co-conspirators;

90.  Defendant Conspirators, through creation of the MERS system alleged herein, adopted and implemented a system of residential lending underwriting guidelines for use in Arizona which was designed to, and did, generate unprecedented profits for Defendant Conspirators and their co-conspirators, corporate officers and directors, at the expense of Plaintiffs and other similarly

situated persons that Defendant Conspirators fraudulently induced into taking out residential loans on which Defendant Conspirators and their co-conspirators knew that Plaintiffs and others like them would likely default (in fact, in many cases, the Defendant Conspirators and other investors, were paid more if the loans defaulted), and which would likely result in foreclosure.  Defendant Conspirators issued these loans with reckless disregard and with intentional indifference of the likelihood of such foreclosure.

91. The MERS system was created to unlawfully hide and insulate predatory loan brokers and originators from accountability and liability by informing all lenders who originated loans naming MERS as the beneficiary of the following:

92. MERS would never own or acquire any actual beneficial interest in any loan in which it was named as beneficiary under the deed of trust.

93. MERS could be named as beneficiary for purposes of public notice and notice to the borrower and would act in that capacity if so designated by the lender who originated the loan.

94. Upon information and belief, Defendant Conspirators and their co-conspirators' intent and purpose in the creation, management, operation and control of MERS was, without limitation, to make it impossible for anyone, other than Defendant Conspirators who created and controlled MERS, to identify the actual beneficial owner of any loan or the property used as collateral to secure the loan until such

time, if any, that a foreclosure action was initiated.  As a result, the identity of the actual beneficial owner was intentionally hidden from Plaintiffs and other similarly situated individuals.

95. The creation of the MERS system by the Defendant Conspirators, was dependent on fraudulent and deceptive practices that included, but were not limited to, making loans to consumers such as Plaintiffs in violation of the Truth in Lending Act, the Real Estate Settlement Procedures Act, and created a system to unlawfully deprive Plaintiffs of Plaintiffs' interest in their home.

96. As a result of the actions of Defendant Conspirators as described herein, Plaintiffs has suffered injuries which include mental anguish, emotional distress, embarrassment, humiliation, loss of reputation, and a decreased credit rating that has, and will, impair Plaintiffs' ability to obtain credit at favorable terms, the loss or anticipated loss of Plaintiffs' home, and other  financial losses according to proof.  Plaintiffs have incurred attorneys' fees and costs in this matter.

97. Defendant Conspirators' actions were wanton, willful and reckless, and justify an award of punitive damages against Defendant Conspirators, and each of them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

A. This Court declare that Defendants are not entitled to enforce the underlying promissory
   Note described in the security instrument;

B. This court declare that Defendants have no legal claim to title on the subject property;

C. This court enjoin Defendants from conducting a Trustee's Sale on the subject property;

D. Plaintiffs be awarded monetary damages against Defendants, jointly and severally;

E. Plaintiffs be awarded statutory damages for Unfair Debt Collection practices under the federal and Arizona statutes;

F. Attorneys fees be awarded Plaintiffs as may be permitted by law;

G. Plaintiffs be awarded treble damages as permitted by law;

H. That prejudgment interest be awarded Plaintiffs as permitted by law; and

I. For such other and further equitable relief, declaratory relief and legal damages as may be permitted by law and as the court may consider just and proper.


**RESPECTFULLY SUBMITTED** this 1st day of September 2009.

**The Law Offices of Beth K. Findsen, PLLC**

By:_____/s/ Beth K. Findsen _____
        Beth K. Findsen
        7279 East Adobe Drive, Suite 120
        Scottsdale, Arizona 85255
    Attorney for Plaintiffs Edel Molina and Maria
        Hernandez

1
2
3
4
5
6        I hereby certify that on September 1, 2009, I electronically transmitted the
7   attached document to the Clerk' office using the CM/ECF System for filing and
    transmittal of a Notice of Electronic Filing to Following CM/ECF registrants:
8
9
10  By:    s/ Zeke Contreras
11           Zeke Contreras, Legal Assistant
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28